PENNY SHIPLER, APPELLEE AND CROSS-APPELLANT, V. GENERAL MOTORS CORPORATION, A FOREIGN CORPORATION, APPELLEE AND CROSS-APPELLANT, AND KENNETH LONG, APPELLANT AND CROSS-APPELLEE.

710 N.W.2d 807

Filed March 10, 2006. No. S-03-1472.

Gail S. Perry and Jenny L. Panko, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., for appellant.

Jeanelle R. Lust and William Sutter, of Knudsen, Berkheimer, Richardson & Endacott, L.L.P., and Frank M. Hinman, David M. Heilbron, Marc R. Bruner, Lee G. Sullivan, May Y. Lee, and Rianne E. Nolan, of Bingham & McCutchen, L.L.P., and Fred J. Fresard and Andrea L. Laginess, of Bowman & Brooke, and Frank Nizio, of McGuire & Woods, L.L.P., for appellee General Motors Corporation.

Dan L. McCord, of McCord & Burns Law Firm, and Michael J. Piuze for appellee Penny Shipler.

Jeffry D. Patterson, of Bartle & Geier Law Firm, for amicus curiae Nebraska Association of Trial Attorneys.

Gregory D. Barton, of Harding, Schultz & Downs, and Mark S. Olson, of Oppenheimer, Wolff & Donnelly, L.L.P., and, of Counsel, Hugh F. Young, Jr., for amicus curiae Product Liability Advisory Council, Inc.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## I. NATURE OF CASE

Penny Shipler brought this action against General Motors Corporation (GM) and Kenneth Long after she was injured in a motor vehicle rollover that rendered her a quadriplegic. GM and Long filed separate notices of appeal from a final judgment of

$18,583,900 entered following a jury trial in Lancaster County District Court. Shipler has cross-appealed.

## II. SCOPE OF REVIEW

■ A jury verdict will not be set aside unless clearly wrong, and it is sufficient if any competent evidence is presented to the jury upon which it could find for the successful party. *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 694 N.W.2d 610 (2005).

■ Whether a jury instruction given by a trial court is correct is a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Id.*

## III. FACTS

On September 11, 1997, Long lost control of his 1996 Chevrolet S-10 Blazer, and the Blazer rolled at least four times. Shipler, who was riding in the front passenger seat, was rendered a quadriplegic as a result of the rollover.

Shipler sued GM and Long, claiming that the roof of the Blazer was defective and had crushed inward, causing her injury. She alleged that GM, the manufacturer of the Blazer, was negligent in failing to use reasonable care in designing the Blazer's roof and in failing to adequately warn her of the dangers associated with the roof. Her second theory, based upon strict liability, alleged that the roof structure of the Blazer was defective at the time it left GM's possession. Shipler alleged that the defect made the Blazer unreasonably dangerous for its intended use and created a risk of harm beyond that which would be contemplated by the ordinary foreseeable user.

GM asserted that Long was a proximate cause of the rollover. It denied any negligence and denied that the Blazer was designed with an unreasonably weak roof structure over the front passenger seat compartment or that there were any defects in the passenger restraint system. GM denied any knowledge that the design of the Blazer exposed passengers to an unreasonable risk of injury which was foreseeable by GM. It denied that the Blazer's roof design or restraint system created a risk of harm to a passenger or made the vehicle unreasonably dangerous for its

intended use as a passenger vehicle. Prior to trial, Long admitted that his negligence was the cause of the accident.

At trial, GM sought to present evidence of Shipler's alleged contributory negligence and Long's comparative fault. In an offer of proof, testimony was offered that Shipler and Long had been drinking before the accident. The trial court excluded evidence regarding alcohol consumption by Shipler and Long, concluding that such evidence was not relevant in a crashworthiness case.

When the accident occurred, Shipler's infant son was sitting in her lap, and the passenger seatbelt was fastened over both of them. The infant was ejected in the rollover, and GM offered to prove that the infant's presence under the seatbelt created slack and therefore enhanced Shipler's injury. In her initial petition, she alleged that she was restrained with both a lap belt and a shoulder belt. The trial court excluded evidence of Shipler's use of the seatbelt in this manner but reduced her damages by 5 percent under Nebraska's seatbelt law, Neb. Rev. Stat. § 60-6,273 (Reissue 2004).

The issues presented for trial were whether GM was negligent in the design of the Blazer's roof, whether GM was strictly liable for a defect in the design of the roof, whether the negligence or defect in design caused Shipler's injury, and the nature and extent of Shipler's damages.

Following a 6-week trial, the jury returned a verdict for Shipler and against GM and Long, and awarded her damages of $19,562,000. The trial court entered an amended judgment of $18,583,900, based on the court's determination that Shipler agreed to eliminate the issue of whether the seatbelt was faulty in exchange for a 5-percent reduction in the judgment amount as provided by statute. GM's motion for new trial was overruled. On January 14, 2004, the trial court entered an order finding that Shipler was entitled to prejudgment interest on the portion of the judgment that exceeded $5 million from February 21, 2001, at the rate of 7.052 percent per annum. GM and Long filed separate notices of appeal, and Shipler cross-appealed.

## IV. ASSIGNMENTS OF ERROR

GM claims, summarized and restated, that the trial court erred (1) in improperly instructing the jury, in refusing to provide a

defense verdict form, in giving oral instructions, and in giving a coercive *Allen* (*Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896)), or "dynamite," instruction to the deadlocked jury; (2) in barring GM's contributory negligence defense and in refusing to permit the jury to allocate liability for noneconomic damages in proportion to percentage of fault; (3) in excluding evidence of Shipler's seatbelt misuse; (4) in admitting evidence of dissimilar incidents; and (5) in allowing prejudicial testimony and giving improper instructions on the federal Motor Vehicle Safety Standard 216 (hereinafter FMVSS 216), the federal roof strength standard. GM also assigns as error that the verdict was excessive.

Long claims the trial court erred (1) in giving a limitation in the jury instructions that narrowed Shipler's injuries to quadriplegia only and in refusing to permit the jury to allocate damages between GM and Long based on which injuries were caused by the conduct of each; (2) in denying Long's multiple motions to dismiss because no issues were preserved against Long in the pretrial order; (3) in erroneously instructing the jury as to the possible verdicts that could be rendered and in failing to provide the jury with a defense verdict form allowing the jury to find in favor of GM and Long; (4) in failing to strike the award for future wage loss because such claim was supported by speculative and insufficient expert testimony; (5) in giving a detailed limiting instruction regarding Shipler's collateral source benefits that incited the jury's sympathy; and (6) in upholding the jury's excessive verdict, which was the result of passion and prejudice.

Shipler cross-appeals that the trial court erred in reducing the jury's damage award by 5 percent.

## V. ANALYSIS

### 1. ERRONEOUS JURY INSTRUCTIONS AND *ALLEN* CHARGE

GM asserts that the trial court erred in its instructions on liability; erred in refusing to provide a defense verdict form; erred in instructing orally, outside court and without notice; and erred in giving a second coercive *Allen* charge.

### (a) Jury Instructions

GM argues the trial court erroneously instructed the jury that if Long was not found liable, GM must be held liable. It claims

such instructions amounted to granting a directed verdict for Shipler.

The trial court instructed the jury that it could reach one of three possible verdicts: (1) that only GM and not Long proximately caused Shipler's quadriplegia, (2) that only Long and not GM proximately caused Shipler's quadriplegia, or (3) that GM and Long each proximately caused Shipler's quadriplegia. It is GM's position that such instructions were legally incorrect and unfair because GM's liability depended upon Shipler's proof of negligence or defective design as the cause of her injury and the instructions told the jury to hold liable either Long or GM, or both. GM claims the jury should have been given a form allowing it to find both defendants not liable, which GM argues the court incorrectly concluded was not an option. Thus, GM claims the court erroneously directed the jury to find that GM was liable if Long was not, regardless of whether Shipler had proved her case against GM.

The trial court directed the jury that before Shipler could recover against GM, she must prove either negligence or strict liability. The court instructed that in order to prove negligence, Shipler must show by the greater weight of the evidence that GM breached its duty to her by failing to use reasonable care in the design of the Blazer's roof in view of the foreseeable risk of injury and that the negligence was a proximate cause of Shipler's damages.

The jury was instructed that to prove strict liability, Shipler must demonstrate that GM placed the Blazer on the market; that at the time the Blazer left GM's possession, it was defective in the way claimed by Shipler; that this defect made the Blazer unreasonably dangerous for its intended use or for any use GM could reasonably have foreseen; and that the defect was a proximate cause of Shipler's damages. The jury was instructed that if Shipler did not meet her burden of proof on either theory, the verdict must be for GM. If Shipler met the burden of proof on either of the theories against GM, the verdict must be for Shipler.

The jury was instructed as to Long that Shipler was required to prove his negligence was a proximate cause of her damages. If she did not meet the burden of proof against Long, then the verdict must be for Long. If she met the burden of proof, then the

verdict must be in favor of Shipler. If Shipler met her burden of proof as to both defendants, then a single verdict should be returned against both defendants without a determination of the amount that an individual defendant was obligated to pay.

■ Whether a jury instruction given by a trial court is correct is a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 694 N.W.2d 610 (2005). In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Gary's Implement v. Bridgeport Tractor Parts*, 270 Neb. 286, 702 N.W.2d 355 (2005).

GM proposed an instruction stating if Shipler did not prove that GM failed to use reasonable care in the design of the roof structure of the Blazer and that such failure proximately caused her injury, then the verdict must be for GM. GM's proposed instruction concerning strict liability stated Shipler must prove that GM placed the Blazer on the market; that at the time it left GM's possession, the Blazer was defective in one or more of the ways claimed by Shipler; that the defect made the Blazer unreasonably dangerous for its intended use or for any use GM could reasonably have foreseen; and that the defect was a proximate cause of damage to Shipler.

■ Both the proposed instructions and the instructions given by the trial court were similar to the Nebraska Jury Instructions. The general rule is that whenever applicable, the Nebraska Jury Instructions are to be used. *Curry v. Lewis & Clark NRD*, 267 Neb. 857, 678 N.W.2d 95 (2004). If the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal. *Id.* A litigant is entitled to have the jury instructed upon only those theories of the case which are presented by the pleadings and which are supported by competent evidence. *Pleiss v. Barnes*, 260 Neb. 770, 619 N.W.2d 825 (2000).

The jury was instructed as to the negligence and strict liability theories presented by the parties. The instructions given

correctly stated the law and adequately covered the issues to be submitted to the jury. GM has not shown that the instructions were prejudicial or otherwise adversely affected a substantial right of GM. It has not demonstrated any prejudice from the jury instructions given.

### (b) Additional Verdict Form

GM claims that it should be granted a new trial because of an alleged oral communication between the trial court and the jury concerning an additional verdict form that would have allowed the jury to find for the defendants. At the hearing on its motion for new trial, GM offered a juror affidavit stating the foreperson had asked the bailiff about an additional verdict form that would allow the jury to find for the defendants. The juror asserted that the bailiff checked with the court and that the bailiff told the jury that it had "all possibilities before [it]." GM argues that the court's statement implied at least one of the defendants was liable and that this implication was by itself prejudicial error.

The trial court sustained Shipler's objection to the affidavit when it was offered at the hearing on the motion for new trial. GM has not assigned as error the trial court's ruling to exclude the affidavit. See *Heitzman v. Thompson*, 270 Neb. 600, 705 N.W.2d 426 (2005) (errors must be specifically assigned and argued to be considered by appellate court). Therefore, whether the court properly refused to admit the affidavit into evidence is not before us. Without the affidavit, there is no evidence that the jury requested an alternative verdict form or that the trial court communicated with the jury concerning the issue.

Even if the jury was told that it had all the necessary verdict forms, we conclude that the defendants were not prejudiced by the trial court's statement. In overruling the motion for new trial, the court concluded it would not have been proper to present a fourth verdict form to the jury. The court noted that Long had originally admitted that he negligently caused the rollover accident, but denied causing injury to Shipler. Long admitted later that he negligently caused the rollover accident and that he caused some injury to Shipler. The court stated that it had contemplated the possibility of a fourth verdict form, but when Long changed his position, a fourth verdict form was no longer

available. Long's defense was that had it not been for GM's design of the Blazer's roof, Shipler would not have sustained the paralyzing injury even though Long caused the accident and other injuries. The court said: "If the jury had found that GM was not negligent and had not placed an unreasonably dangerous product on the market, then Long was responsible for the paralyzing injury. There was simply no other alternative, given Long's admissions."

We conclude there were only three verdict forms that the jury could properly consider. Long admitted liability, and the parties stipulated that his operation of the Blazer caused the accident. The remaining issues were whether Long's negligence was the sole cause of the injury, whether the Blazer's roof was the sole cause of the injury, or whether both GM and Long proximately caused the injury.

The jury may be instructed upon only those theories of the case which are supported by competent evidence. See *Pleiss v. Barnes*, 260 Neb. 770, 619 N.W.2d 825 (2000). Jury instructions should be confined to the issues presented by the pleadings and supported by the evidence. *Maxwell v. Montey*, 262 Neb. 160, 631 N.W.2d 455 (2001). A trial court need not instruct the jury on an issue where the facts do not justify such an instruction. *Farmers Mut. Ins. Co. v. Kment*, 265 Neb. 655, 658 N.W.2d 662 (2003). The trial court correctly determined the jury could not be instructed that it could find in favor of both defendants. The verdict forms did not relieve Shipler of her burden of proof as to both defendants. The question was whether Long, GM, or both were liable for Shipler's quadriplegia.

(c) Oral Communication to Continue Deliberations

GM complains that the trial court improperly communicated with the jury through the bailiff and without notice to counsel, directing the jury to continue deliberations when it was deadlocked. On Tuesday, September 23, 2003, the court made a record that at some time after 4 p.m. on Monday, September 22, the presiding juror communicated by telephone with the bailiff that the jury was deadlocked. At that time, the court instructed the bailiff to tell the jury that it should continue deliberations for the remainder of the afternoon and that if the jury's status was the

same on Tuesday morning, the jury should inform the court. During a hearing outside the presence of the jury at 4 p.m. on Tuesday, the court stated that it had not received any further communication from the jury until 3:43 p.m. that day when the jury again stated that it was deadlocked.

Not every oral ex parte communication by the court to the jury is improper and requires a new trial. See *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002). The communication must be prejudicial. Here, no prejudice occurred. The jury was told that it should continue deliberating to the end of the day, which was less than an hour. We conclude that the communication was harmless because it had no tendency to influence the verdict. See *State v. Thomas, supra.*

### (d) *Allen* Charge

GM claims that a formal supplemental instruction given by the trial court was an impermissible *Allen* instruction (directive from court to deadlocked jury to continue deliberating). See *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896).

The jury began deliberations at 4:56 p.m. on Thursday, September 18, 2003. At 4:30 p.m. on Tuesday, September 23, the trial court met with counsel for all parties outside the presence of the jury. The court stated that it had received a note that afternoon from the jury foreperson again stating that the jury was deadlocked. The court stated that it had conferred with counsel and planned to bring the jury in and, without asking as to the division of the jury, give a supplemental instruction, if appropriate. GM's counsel proposed its own instruction for use with a deadlocked jury, claiming that the court's proposed instruction was coercive and would cause jurors to go with a majority and give up their conscientious scruples.

At 4:42 p.m., on September 23, 2003, the jury returned to the courtroom, and all counsel were present. The foreperson told the trial court that the jury was deadlocked after 3 days of deliberation. The court then gave the jury a supplemental instruction stating that if the jury was not able to reach a verdict within a reasonable time, the court would declare the jury deadlocked or hung, the jury would be discharged, and a mistrial would be declared. The court informed the jury of the meaning of a mistrial

206

and offered some suggestions to consider as it resumed its deliberations, including rearranging seats, taking turns telling other jurors the weaknesses of their position, and avoiding interruption or comment until each had time to talk. The court explained that it was not seeking to force agreement or to make the jury think that it would be forced to deliberate until it agreed. Given this supplemental instruction, the jury continued to deliberate for another 3 days before it reached a verdict.

GM objects to the trial court's communication with the jury in part based on Neb. Rev. Stat. §§ 25-1115 and 25-1116 (Reissue 1995). These statutes prohibit oral instructions and relate to further explanation of instructions previously given or to explanation of the facts or the law of the case. In the present case, the complained-of communication was given in court after consultation with counsel for all parties, and counsel were present when the instruction was given. The instruction was recorded.

In *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002), this court was asked to find that the defendant was prejudiced by an *Allen* charge. We noted that an *Allen* charge to the jury given orally without notice to the parties or their counsel violates §§ 25-1115 and 25-1116 and is improper. "If the record affirmatively shows that the defendant has been prejudiced by private communication between the trial court and jurors, it is reversible error, and a new trial should be granted. Reversal is not required if the record affirmatively shows communication had no tendency to influence the verdict." *State v. Thomas*, 262 Neb. at 1001, 637 N.W.2d at 651. In *Thomas*, we found that the record indicated that the trial court only directed the jury to continue its deliberations and that the direction did not have a tendency to influence the verdict.

In *State v. Garza*, 185 Neb. 445, 176 N.W.2d 664 (1970), the trial court admonished the jury after being informed that it was deadlocked by a vote of 11 to 1. The court told the jury that although it had deliberated for more than 15 hours, the court could not be convinced that there was no possibility of agreement. A guilty verdict was arrived at 45 minutes later. This court noted that a factor to consider in reviewing this type of instruction is whether it tended to coerce a dissenting juror or jurors. See *Potard v. State*, 140 Neb. 116, 299 N.W. 362 (1941) (court

rejected *Allen*-type instruction; only purpose for instruction was to peremptorily direct agreement, which invaded province of jury). In *Garza,* this court referred to the ABA Standards Relating to Trial by Jury § 5.4 (Approved Draft 1968), which states that the court may require the jury to continue its deliberations, but that the court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

In order to obtain relief concerning the alleged oral instructions or the *Allen* charge, GM must demonstrate that it was prejudiced by the trial court's actions. An instruction directing the jury to continue its deliberations does not require reversal if it cannot be shown that it tended to coerce the jury. In this case, the supplemental instruction was given on Tuesday, September 23, 2003, after the jury had deliberated for 3 days. The jury verdict was not returned until 1:15 p.m. on Friday, September 26. The record does not support a finding that the jury was coerced by the supplemental instruction given in the presence of counsel.

GM has not demonstrated that it was prejudiced by any of the trial court's instructions, by the failure to provide a fourth verdict form, by the court's communicating with the jury outside the presence of counsel, or by the court's giving a supplemental instruction to continue deliberations. This assignment of error has no merit.

## 2. CONTRIBUTORY NEGLIGENCE AND APPORTIONMENT OF DAMAGES

GM argues that the trial court erred in barring its contributory negligence defense. Both GM and Long claim the court erred in refusing to permit the jury to allocate liability for non-economic damages in proportion to a percentage of fault.

GM claims that Long's driving while under the influence of alcohol, his negligent control of the Blazer, and Shipler's knowing decision to drink alcohol and ride in the vehicle with Long were evidence of contributory negligence which the jury should have been entitled to consider. GM asserts that under Nebraska law, contributory negligence is a defense which would diminish proportionately the amount awarded as damages for any injury attributable to Long's negligence or Shipler's contributory

negligence. GM points out that in civil cases not involving a common enterprise or plan, where contributory negligence is a defense and multiple defendants are involved, noneconomic damages must be allocated in proportion to each defendant's percentage of negligence. See Neb. Rev. Stat. § 25-21,185.10 (Reissue 1995). It argues that the trial court erred in concluding that contributory negligence did not apply to a crashworthiness case.

The trial court did not determine whether contributory negligence is a defense to a cause of action based upon strict liability. Instead, the court concluded:

> The particular theory under which [Shipler] seeks recovery in this case is what has been termed a crashworthiness theory of recovery. Contributory negligence is not a defense that has been recognized either by statute or by the courts as applying to a crashworthiness theory of recovery. It is arguable, and this court does not determine, whether or not § 25-21,185.09 recognizes contributory negligence as a defense in a strict liability action. . . .

> The inherent nature of the crashworthiness or enhanced injury theory of liability disallows the submission of issues of contributory negligence to a jury. A conceptual problem is created when one tries to apply concepts of contributory negligence under a crashworthiness theory of recovery that is unique to this theory as compared to other theories of strict liability. In crashworthiness cases, two distinct events are alleged by the Plaintiff: the initial accident and the subsequent "second collision" for which the Plaintiff seeks recovery from the defendant manufacturer. The crashworthiness theory, by its terms, assumes that manufacturers know accidents involving their vehicles will occur and that "[a]ny participation by the plaintiff in bringing the accident about is quite beside the point. . . . Any negligence by [the] driver [of the vehicle], or even by [the plaintiff] himself, in connection with the original crash cannot be used by the manufacturer in defending against [the plaintiff's] enhancement claim."

The trial court concluded that because Shipler had alleged that her quadriplegia was due entirely to GM's defective design, which caused a "second collision," and because Long had admitted

liability for the initial collision, evidence of alcohol consumption was inadmissible evidence not relevant to any disputed fact.

### (a) Negligence Claim

GM argues that because Shipler conceded that contributory negligence was a defense to a cause of action for negligence in a crashworthiness case, Long's comparative negligence was an issue as to that claim. It asserts that both Shipler's and Long's negligence must be compared to GM's liability and that Shipler's noneconomic damages should be apportioned accordingly. See § 25-21,185.10. We will address this argument before proceeding further.

■ A general finding that a judgment should be for a certain party warrants the conclusion that the finder of fact found in favor of that party on all triable issues. *Foiles v. Midwest Street Rod Assn. of Omaha*, 254 Neb. 552, 578 N.W.2d 418 (1998). Because the jury returned a verdict under both theories of negligence and strict liability, we conclude that the jury found in favor of Shipler on both theories of recovery. Therefore, in order to establish prejudicial error that would require a new trial, GM must establish in the strict liability action that it was entitled to present evidence of Long's negligence and Shipler's alleged contributory negligence. We need not address whether the trial court should have permitted evidence of Long's and Shipler's negligence in the cause of action based upon GM's alleged negligence. See *id.*

In *Foiles*, the plaintiff alleged three theories of recovery: fraudulent misrepresentation, implied bailment, and negligence. The court entered a general verdict, finding in favor of the plaintiff, and we therefore presumed that the plaintiff prevailed on each theory. In order to succeed on appeal, the defendants were required to establish that the court was clearly wrong as to each theory of recovery. In the case at bar, GM must establish that Long's negligence and Shipler's alleged contributory negligence were defenses to Shipler's cause of action based upon strict liability in tort.

### (b) Strict Liability Claim

In 1992, the Nebraska Legislature amended the comparative negligence scheme in which the contributory negligence of the claimant diminishes proportionately the amount awarded as

damages (as long as the claimant's negligence is less than 50 percent; otherwise, he or she is barred from recovery). See 1992 Neb. Laws, L.B. 262. GM argues that contributory negligence remains a defense to strict liability in tort and that had the Legislature wanted to eliminate the contributory negligence defense in strict liability claims, it would have explicitly done so. GM argues that the revised law provides a broader framework in which a plaintiff's negligence may be considered in any action where contributory negligence may be, pursuant to law, a defense, regardless of the theory of liability.

On the other hand, Shipler argues that the 1992 amendment specifically removed all language extending the defense of contributory or comparative negligence to an action based upon strict liability. Shipler contends that Neb. Rev. Stat. § 25-21,185.07 (Reissue 1995) has limited application and applies only to civil actions to which contributory negligence may be, pursuant to law, a defense. Shipler points out that contributory negligence does not apply to all civil actions regardless of the theory of liability. For example, contributory negligence does not apply to intentional torts. See *Brandon v. County of Richardson*, 261 Neb. 636, 624 N.W.2d 604 (2001). It does not apply when a patient's conduct provides the occasion for medical action which later is the subject of a medical malpractice claim. See *Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. 1, 459 N.W.2d 178 (1990). Nebraska's comparative negligence law applies only to civil actions in which contributory negligence is a defense. *Brandon v. County of Richardson, supra.* See *Omaha Nat. Bank v. Manufacturers Life Ins. Co.*, 213 Neb. 873, 332 N.W.2d 196 (1983).

The question presented is whether Nebraska law permits contributory negligence to be asserted as a defense in an action based upon strict liability.

### (i) Background

Nebraska adopted the doctrine of strict liability in product liability cases in *Asher v. Coca Cola Bottling Co.*, 172 Neb. 855, 112 N.W.2d 252 (1961). In *Kohler v. Ford Motor Co.*, 187 Neb. 428, 191 N.W.2d 601 (1971), we held a manufacturer was strictly liable in tort when an article he placed on the market, knowing that it was to be used without inspection for defects,

proved to have a defect which caused an injury to a person rightfully using that product. In *Hawkins Constr. Co. v. Matthews Co., Inc.*, 190 Neb. 546, 567, 209 N.W.2d 643, 655 (1973), *disapproved on other grounds, National Crane Corp. v. Ohio Steel Tube Co.*, 213 Neb. 782, 332 N.W.2d 39 (1983), the court stated: "It is clear that traditional 'contributory negligence' in the sense of a failure to discover a defect or to guard against it, is not a defense to a suit in strict tort, or for a breach of warranty. Assumption of risk and misuse of the product are."

Historically, the application of contributory negligence in strict liability cases has varied with legislative enactments. At the time of our decision in *Hawkins Constr. Co.*, the law addressed contributory negligence in actions based upon the negligence of another.

> In all actions brought to recover damages for injuries to a person or to his property caused by the negligence of another, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery when the contributory negligence of the plaintiff was slight and the negligence of the defendant was gross in comparison . . . .

See Neb. Rev. Stat. § 25-1151 (Reissue 1975).

In *Melia v. Ford Motor Co.*, 534 F.2d 795 (8th Cir. 1976), the federal appellate court had its first opportunity to examine our contributory negligence statute in an action based upon strict liability. The federal district court had instructed the jury that the defense of negligence or contributory negligence on the part of the plaintiff's decedent was not available to the defendant in an action based on product liability in the manufacture of a chattel. On appeal, the U.S. Court of Appeals for the Eighth Circuit stated that

> the application of the Nebraska comparative negligence statute would, under the language of the statute, be extremely confusing and inappropriate in a strict liability case. Under Nebraska law in order for the comparative negligence statute to be invoked the plaintiff's negligence must be slight and the defendant's negligence gross in comparison thereto. [Citations omitted.] In strict liability cases proof of negligence or degree of fault is not required.

*Id.* at 802.

Subsequently, the Nebraska Legislature amended § 25-1151 to permit consideration of the plaintiff's negligence in strict liability tort actions. The statute provided:

> In all actions brought to recover damages for injuries to a person or to his property caused by the negligence *or act or omission giving rise to strict liability in tort* of another, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery when the contributory negligence of the plaintiff was slight and the negligence *or act or omission giving rise to strict liability in tort* of the defendant was gross in comparison . . . .

(Emphasis supplied.) See § 25-1151 (Reissue 1979). Therefore, by amendment, the Legislature expressly made contributory negligence applicable to strict liability in tort.

In 1992, the Legislature again amended the law regarding contributory and comparative negligence. Prior to the revised comparative negligence scheme implemented by the 1992 amendments, this court had not fully addressed whether contributory or comparative negligence applied in strict liability actions. In *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987), we stated that contributory negligence defenses in strict liability actions which consisted of merely a plaintiff's failure to discover a defect or guard against the possibility of a defect's existence were not available defenses in actions based on strict liability for defective and unreasonably dangerous products. See, also, *Hawkins Constr. Co. v. Matthews Co., Inc.*, 190 Neb. 546, 209 N.W.2d 643 (1973), *disapproved on other grounds, National Crane Corp. v. Ohio Steel Tube Co.*, 213 Neb. 782, 332 N.W.2d 39 (1983). We did not address whether contributory or comparative negligence generally applied in strict liability tort actions.

The 1992 amendment removed all references to strict liability from the comparative negligence statutes.

> In all actions *accruing before February 8, 1992*, brought to recover damages for injuries to a person or to property caused by the negligence or act or omission giving rise to strict liability in tort of another, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery when the contributory negligence of the

plaintiff was slight and the negligence or act or omission giving rise to strict liability in tort of the defendant was gross in comparison . . . .

(Emphasis supplied.) Neb. Rev. Stat. § 25-21,185 (Reissue 1995). Section 25-21,185.07 provides in part:

Sections 25-21,185.07 to 25-21,185.12 shall apply to all civil actions to which contributory negligence may be, pursuant to law, a defense that accrue on or after February 8, 1992, for damages arising out of injury to or death of a person or harm to property regardless of the theory of liability. Actions accruing prior to February 8, 1992, shall be governed by the laws in effect immediately prior to such date.

Since the 1992 amendment, this court has not entertained the question of whether evidence of contributory negligence is relevant in a product liability case based on strict liability. The case of *Jay v. Moog Automotive*, 264 Neb. 875, 652 N.W.2d 872 (2002), involved the improper use of a strut spring compressor. We concluded that the defendant's allegation of improper use was in substance the affirmative defense of misuse, not contributory negligence.

Some states have revised their systems of comparative negligence and have replaced the term "negligence" with the term "fault." Although the terms may be used interchangeably, when a distinction is made, fault is generally regarded as a broader term "encompassing a wider range of culpable behavior or responsibility for injury than that covered by the term 'negligence.'" 3 American Law of Products Liability 3d § 40:10 at 40-17 (John D. Hodson & Richard E. Kaye eds., 2003). "Comparative fault" schemes generally provide that a plaintiff's recovery in a strict liability action may be reduced proportionately by the plaintiff's negligence. See, e.g., Wash. Rev. Code Ann. §§ 4.22.005 and 4.22.015 (West 2005); *Lundberg v. All-Pure Chemical Co.*, 55 Wash. App. 181, 186, 777 P.2d 15, 19 (1989) (commenting that "the Legislature has determined that the comparative fault doctrine shall apply to all actions based on 'fault,' including strict liability and product liability claims").

States that preclude the defense of contributory negligence in strict product liability actions reason that "[s]ince strict liability is based on a product defect rather than the negligence

of the manufacturer or seller, it is inappropriate and confusing to inject negligence principles into a strict liability action." 3 American Law of Products Liability 3d, *supra*, § 40:43 at 40-71 to 40-72. Other states holding that comparative fault principles are not applicable in strict product liability actions have based their rulings, at least in part, on the fact that their comparative negligence statutes are limited to negligence actions. See, *Young's Machine Co. v. Long*, 100 Nev. 692, 693, 692 P.2d 24, 25 (1984) (holding that comparative negligence statute cannot be interpreted to include strict product liability in "that class of actions in which contributory negligence may be asserted as a defense"); *Kirkland v. General Motors Corporation*, 521 P.2d 1353, 1367 (Okla. 1974) (stating that statutory comparative negligence scheme has "no application to manufacturers' products liability, for its application is specifically limited to *negligence actions*"); *Staymates v. ITT Holub Industries*, 364 Pa. Super. 37, 47, 527 A.2d 140, 145 (1987) (holding that comparative negligence is inapplicable in strict product liability actions and commenting that "Pennsylvania's Comparative Negligence Act . . . by its own terms, is applicable only to 'actions brought to recover damages for negligence' "); *Schneider Nat., Inc. v. Holland Hitch Co.*, 843 P.2d 561, 588 (Wyo. 1992) (comparative negligence statute does not " 'permit strict liability . . . to be considered and weighed in the same manner as negligence in determining each actor's "percentage of fault" for the plaintiff's injuries' ").

Other states have expressly excluded the defense of contributory negligence in strict product liability actions either by statute, see Ariz. Rev. Stat. Ann. § 12-2509B (West 2003), or by judicial fiat where strict product liability is part of common law, see *Smith v. Smith*, 278 N.W.2d 155, 160-61 (S.D. 1979) (holding that "the plaintiff's or the defendant's negligence is irrelevant and contributory negligence is not a defense in strict liability").

*Schneider Nat., Inc.* went to the Wyoming Supreme Court on certified questions from the U.S. Court of Appeals for the 10th Circuit. One of the questions to be answered was as follows:

"Does Wyoming's current comparative negligence statute, W.S. § 1-1-109 (1988), which requires that damages in an action 'to recover damages for negligence' be allocated

according to the 'percentage of fault attributable to each actor,' permit strict liability and breach of warranty to be considered and weighed in the same manner as negligence in determining each actor's 'percentage of fault' for the plaintiff's injuries and their corresponding liability for the plaintiff's damages?"

*Schneider Nat., Inc. v. Holland Hitch Co.*, 843 P.2d at 563.

In that case, the defendants sought indemnity against the third-party defendants and advanced the following three theories of recovery: strict liability for defective design and manufacture of a hitch that was unreasonably dangerous at the time it was sold; breach of an express and implied warranty; and negligent design manufacturing, testing, and inspection.

At the time, Wyoming's comparative negligence statute provided in relevant part:

"Contributory negligence shall not bar a recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, if the contributory negligence of the said person is not more than fifty percent (50%) of the total fault. Any damages allowed shall be diminished in proportion to the amount of negligence attributed to the person recovering. . . ."

*Id.* at 566.

Whether comparative negligence and comparative fault principles applied to theories of recovery based on strict liability or breach of warranty was controlled by the court's decision in *Phillips v. Duro-Last Roofing, Inc.*, 806 P.2d 834 (Wyo. 1991). The *Phillips* court had held that the specific language of Wyoming's comparative negligence statute limited its operation by referring to " 'a recovery in an action . . . to recover damages for negligence.' " 806 P.2d at 835.

The *Schneider Nat., Inc.* court stated that a cause of action premised on a theory of strict liability or breach of warranty was therefore unaffected by the principles of comparative negligence or comparative fault as stated in Wyoming's comparative negligence statute.

In *Smith v. Smith*, 278 N.W.2d 155 (S.D. 1979), an employee whose fingers and thumb were amputated by the blade of a

bandsaw brought a product liability claim against the manufacturer and distributor of the saw and a negligence claim against the employer who owned the saw. On appeal, the South Dakota Supreme Court held that submission of the issue of contributory negligence on strict liability claims against the manufacturer and distributor was prejudicial error requiring reversal.

The *Smith* court stated that with rare exceptions, courts that have adopted the doctrine of strict liability (whether in the precise language of the Restatement (Second) of Torts § 402A (1965) or otherwise) have held that it is substantive. These courts hold that strict liability is not a negligence action with the elements of proof changed, but, rather, it is a wholly different tort action.

> Strict liability is an abandonment of the fault concept in product liability cases. No longer are damages to be borne by one who is culpable; rather they are borne by one who markets the defective product. The question of whether the manufacturer or seller is negligent is meaningless under such a concept; liability is imposed irrespective of his negligence or freedom from it. Even though the manufacturer or seller is able to prove beyond all doubt that the defect was not the result of his negligence, it would avail him nothing. We believe it is inconsistent to hold that the user's negligence is material when the seller's is not.

*Smith v. Smith*, 278 N.W.2d at 160.

### (ii) Statutory Interpretation

Whether contributory negligence is a defense to an action based upon strict liability is a matter of statutory interpretation. Statutory interpretation presents a question of law. *Caspers Constr. Co. v. Nebraska State Patrol*, 270 Neb. 205, 700 N.W.2d 587 (2005). In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning. *Mason v. City of Lincoln*, 266 Neb. 399, 665 N.W.2d 600 (2003). A court must place on a statute a reasonable construction which best achieves the statute's purpose, rather than a construction which would defeat the statute's purpose. *Galaxy Telecom v. J.P. Thiesen & Sons*, 265 Neb. 270, 656 N.W.2d 444 (2003). The last expression of legislative will is the law. *Alegent*

*Health Bergan Mercy Med. Ctr. v. Haworth*, 260 Neb. 63, 615 N.W.2d 460 (2000).

In discerning the meaning of a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. It is the court's duty to discover, if possible, the Legislature's intent from the language of the statute itself. *Capitol City Telephone v. Nebraska Dept. of Rev.*, 264 Neb. 515, 650 N.W.2d 467 (2002). The components of a series or collection of statutes pertaining to a certain subject matter which are in pari materia may be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions of the act are consistent, harmonious, and sensible. *Willers v. Willers*, 255 Neb. 769, 587 N.W.2d 390 (1998).

With the 1992 amendment, the Legislature removed the term "strict liability" from the contributory negligence scheme. We therefore presume that the Legislature was aware that prior to such amendment, the "slight-gross" system applied to strict liability, see § 25-21,185, and that the Legislature purposely removed "strict liability" from the revised statutory scheme. The revised comparative negligence scheme speaks in terms of "negligence." See Neb. Rev. Stat. §§ 25-21,185.07 to 25-21,185.12 (Reissue 1995). Nowhere in the revised scheme has the Legislature employed the term "strict liability." See *id.*

The 1992 amendment created a cutoff point of February 8, 1992, regarding the application of contributory negligence to actions giving rise to strict liability in tort. The Legislature is presumed to have intended a change in the existing law. See *Semler v. Sears, Roebuck & Co.*, 268 Neb. 857, 689 N.W.2d 327 (2004). Had the Legislature intended to permit consideration of the plaintiff's contributory negligence in actions involving strict liability in tort, there would have been no reason to establish a cutoff date for which actions prior to February 8, 1992, would be governed by the laws in effect immediately prior to that date. See § 25-21,185.07. Had the Legislature intended to permit contributory negligence as a defense in all civil actions, it would not have needed to carve out actions accruing prior to February 8, 1992. For actions after that date, the statute refers

218

to civil actions to which contributory negligence "may be" a defense. See *id.*

The Legislature is presumed to know language used in a statute, and if a subsequent act on the same or similar subject uses different terms in the same connection, the court must presume that a change in the law was intended. *Hall v. City of Omaha*, 266 Neb. 127, 663 N.W.2d 97 (2003). We conclude that the Legislature intended to exclude the defense of contributory negligence in strict liability actions.

In *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 438, 412 N.W.2d 56, 67-68 (1987), we pointed out the significant distinction between negligence and strict liability in the context of product liability actions:

> In a cause of action based on negligence, the question involves the manufacturer's conduct, that is, whether the manufacturer's conduct was reasonable in view of the foreseeable risk of injury, whereas in a cause of action based on strict liability in tort, the question involves the quality of the manufactured product, that is, whether the product was unreasonably dangerous.

Statutes pertaining to the same subject matter are to be construed together as if they were one law and effect given to every provision. *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). The language of § 25-21,185.09 allows a jury to compare a plaintiff's contributory negligence to the negligence of a defendant or defendants. It does not provide that the plaintiff's negligence may be applied in the plaintiff's cause of action based upon strict liability in tort. Section 25-21,185.10 allows the jury to compare the negligent conduct of codefendants, mandating that "[e]ach defendant shall be liable only for the amount of noneconomic damages allocated to that defendant in direct proportion to that defendant's percentage of negligence . . . ." Section 25-21,185.10 does not provide that one defendant's negligence may be compared to another in a cause of action for strict liability in tort.

When the Legislature enacted the 1992 amendment, it provided that the contributory negligence of the plaintiff was to be compared to the negligence of other persons against whom

recovery was sought. It did not provide for a comparison of negligence in an action for strict liability in tort.

### (iii) Legislative History

GM claims that the language in § 25-21,185.07, "regardless of the theory of liability," means that contributory negligence may be asserted in a cause of action based upon strict liability. To the extent that such language could be considered ambiguous, the legislative history of the statute supports our interpretation of the law.

We may look to the legislative history to determine intent. Legislative purpose and intent are the focus of our inquiry. A court may examine the legislative history of the act in question in order to ascertain the intent of the Legislature. *Volquardson v. Hartford Ins. Co.*, 264 Neb. 337, 647 N.W.2d 599 (2002).

GM argues that the Legislature intended for contributory negligence to apply in strict liability claims. It points to language by an introducer of one of the comparative negligence bills, who stated: "[T]his standard of liability that we are adopting in LB 88 . . . applies to all cases." See Floor Debate, L.B. 88, 92d Leg., 1st Sess. 850 (Feb. 13, 1991). Our review of that statement indicates that it was not made with regard to theories of liability (e.g., negligence or strict liability), but was made in the context of debate over whether the comparative negligence scheme "should be applied to municipalities and counties as well as to normal cases that don't involve municipalities and counties." *Id.* at 849. The comments were later clarified by the following statement: "[H]istorically . . . negligence, the standard of liability[,] applied to political subdivisions as applied to everybody across the board." *Id.* at 854. The political subdivision issue evoked contentious debate and was eventually decided in a subsequent act (replacing 1991 Neb. Laws, L.B. 88) which provided that tort actions against the state or political subdivisions were to be governed by the State Tort Claims Act, and the Political Subdivisions Tort Claims Act, respectively. See 1992 Neb. Laws, L.B. 262, §§ 7, 8, and 11 (amending Neb. Rev. Stat. §§ 13-902 and 13-910 (Reissue 1991) and 81-8,219 (Cum. Supp. 1990)).

Another introducer of the comparative negligence legislation proposed an amendment (later adopted) which provided that the

law would "apply to actions to which contributory negligence is a defense." See Floor Debate, L.B. 88, 92d Leg., 1st Sess. 831 (Feb. 12, 1991). The introducer explained that "legally what this means is that it won't apply to strict liability and some of those other areas of law." *Id.* No opposition arose, and no counterargument was offered, to this assertion. No other reference was made to strict liability actions throughout the remainder of the debate on the bills that became the comparative negligence statutes.

After considering statutory language and legislative history, we conclude that the Legislature did not intend for the comparative negligence scheme to apply in actions based on strict liability after February 8, 1992. As a result, we determine that the trial court did not err in refusing to admit evidence of Long's and Shipler's negligence in Shipler's action based on strict liability.

### 3. EXCLUSION OF SEATBELT MISUSE EVIDENCE

GM argues that the trial court erred in excluding evidence of Shipler's seatbelt misuse and its effect on her movement during the rollover accident.

Initially, Shipler alleged that GM was negligent in its failure to use reasonable care in the design and manufacture of the passenger restraint system. Before trial, Shipler moved to prohibit any evidence of or reference to the use or misuse of seatbelts at or prior to the time of the accident. Shipler asserted that the issue was irrelevant to the action and that any effort to bring the seatbelt issue before the jury would be an attempt to create unfair prejudice against Shipler and Long. The motion asserted that GM's expert had testified that Shipler would have sustained the same injuries regardless of her use or misuse of the seatbelt. Shipler stated that if the trial court overruled the motion in limine, she would request leave to dismiss the allegations concerning the seatbelt and would stipulate to a 5-percent reduction in damages as provided in § 60-6,273, which states:

> Evidence that a person was not wearing an occupant protection system at the time he or she was injured shall not be admissible in regard to the issue of liability or proximate cause but may be admissible as evidence concerning mitigation of damages, except that it shall not reduce recovery for damages by more than five percent.

GM responded that it had evidence that Shipler had her 9-month-old son under the seatbelt in her lap at the time of the accident. It claimed that it had a seatbelt expert who would testify as to the impact of the child on the amount of slack in the seatbelt. GM claimed the manner in which Shipler moved around during the accident was crucial to how she sustained her injury.

The trial court first overruled Shipler's motion because she had placed the occupant restraint system at issue and because the court found that the prohibition of § 60-6,273 did not apply. Shipler then amended her petition, dismissing the allegations concerning the occupant restraint system.

In a later ruling on the motion in limine, the trial court found all parties had agreed that Shipler was wearing a three-point seatbelt. It found that neither Shipler's nor GM's expert testified that the seatbelt had had any effect on Shipler's movement within the vehicle. GM's expert had opined that Shipler was firmly fastened and that there was no indication of any slack in the belt. GM's expert stated that to some degree in this type of accident, in which the roof collapses, the use of the seatbelt actually enhances the injury by holding the passenger in place.

The trial court found Shipler's expert had stated that no seatbelt could fully restrain an occupant and that Shipler's seatbelt had some slight loosening when she was upside down as the roof was crushing in. The court found that neither expert identified any injury that was either created or enhanced by the way in which Shipler used the belt. It therefore excluded evidence of the seatbelt because it was not relevant to the issues presented to the jury.

GM made two offers of proof related to seatbelt use. GM sought to elicit testimony that Shipler's son was sitting in the front seat, that he was not in a car seat, that he was belted in between Shipler's legs and the seatbelt, and that the lap belt went over both Shipler and her son. GM also sought to question Richard Stalnaker, Ph.D., GM's biomechanics expert, concerning the effect of placing an infant underneath a lap belt. GM said Stalnaker would have testified that the infant's ejection created additional slack in the seatbelt which made Shipler's "impact into the ground . . . more severe." The trial court sustained the objections to this evidence.

Shipler was wearing a seatbelt, but GM claims that it was not worn properly, i.e., in conjunction with her infant, who was ejected, thereby creating slack in the seatbelt. In overruling the defendants' motions for new trial, the trial court found no error in its previous rulings on the seatbelt issue. The court noted that the Legislature had addressed the role of seatbelt misuse by passing a law that damages should be reduced by up to 5 percent if the seatbelt was not in use. The court found that Shipler stipulated before trial to a 5-percent reduction in the judgment when she dropped her claim that the seatbelt was faulty and that the judgment had been reduced in accord with the stipulation. The court stated: "The defendants have received the full benefit that could be accorded them even if the seatbelt [was] not used at all."

The evidence of seatbelt misuse was not admissible in regard to the issue of liability or proximate cause. This is true whether the seatbelt was misused or not used at all. The trial court's reduction of the jury's award by 5 percent represented the full mitigation of damages available. The defendants were not prejudiced by the court's refusal to admit evidence of alleged seatbelt misuse. The defendants have received the maximum benefit that § 60-6,273 allowed.

### 4. Admission of Evidence of Other Similar Incidents

GM asserts that the trial court erred in admitting four exhibits which described 40 other rollover accidents. GM argues that it was prejudicial to admit the evidence because the accidents involved secondary collisions, unbelted victims, partial ejections, and different vehicle models, and because many occurred after the Blazer was manufactured.

GM filed a motion in limine to bar evidence of dissimilar incidents. It argued that the designs of other GM vehicles and other manufacturers' vehicles were not substantially similar to the design of the 1996 Chevrolet S-10 Blazer and were therefore irrelevant and should be excluded.

At a pretrial hearing, one of Shipler's experts, Donald Friedman, testified regarding the elements which he claimed made the incidents similar to the case at bar. All the accidents depicted involved S-10 Chevrolet vehicles and were rollovers.

The accidents demonstrated roof crush that caused severe head or neck injury.

At one of the hearings concerning the admissibility of evidence of other similar incidents, GM made specific objections to each of 39 other similar incidents and to 16 other similar incidents that it claimed occurred after the crash in which Shipler was injured. It argued that other similar incidents were relevant only as to notice to GM of the defect. Shipler argued that evidence of other similar incidents provided proof that there was a defect in the design of the 1996 Chevrolet S-10 Blazer.

The trial court found the incidents were substantially similar because of the nature of the accident (i.e., rollover); there was more than a single revolution of the vehicle; the injury to the victim involved a head or neck injury sustained as a result of contact with the roof of the vehicle, which resulted in severe injury or death; the victim was seated in the same position as Shipler (i.e., in the front seat and on the side of the vehicle that was the second to have contact with the ground); and the vehicle was in the same family of GM vehicles (i.e., 1984 to 1999 Chevrolet S-10 pickup, S-10 extended-cab pickup, or two- or four-door Blazer).

The trial court instructed the jury that the evidence was presented for two purposes: first, in support of Shipler's allegation that the Blazer's roof structure design was defective and, second, to support Shipler's allegation that GM knew of the alleged roof design defect prior to the accident. The jury was directed that it could not use that evidence for any other purpose.

Relevant evidence of other similar accidents or occurrences is admissible to show that a defendant had notice and actual knowledge of a defective condition, provided that the accidents or occurrences were substantially similar; i.e., the prior accidents or occurrences happened under substantially the same circumstances and were caused by the same or similar defects and dangers. *General Motors Corp. v. Lupica*, 237 Va. 516, 379 S.E.2d 311 (1989). "[W]here an individual fails to adequately demonstrate how prior occurrences are substantially similar, evidence of prior occurrences is irrelevant and, thus, inadmissible." *Holden v. Wal-Mart Stores*, 259 Neb. 78, 85, 608 N.W.2d 187, 193 (2000).

██ A plaintiff in a strict liability case may rely on evidence of other similar accidents involving the product to prove defectiveness, but the plaintiff must first establish that there is a substantial similarity of conditions between the other accidents and the accident that injured the plaintiff. *Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978 (Pa. Super. 2005). The proponent of the evidence bears the burden to establish the similarity between the other accidents and the accident at issue before the evidence is admitted. *Id.* The proffered evidence must satisfy the substantial similarity test for it to be properly admitted into evidence, whether to prove defect, causation, or knowledge/notice. *Id.*

██ In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. See *Gerhold Concrete Co. v. St. Paul Fire & Marine Ins.*, 269 Neb. 692, 695 N.W.2d 665 (2005). Because the exercise of judicial discretion is implicit in determinations of relevancy and admissibility under Neb. Rev. Stat. §§ 27-401 and 27-403 (Reissue 1995), the trial court's decision will not be reversed absent an abuse of discretion. *Gerhold Concrete Co. v. St. Paul Fire & Marine Ins., supra.* A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 694 N.W.2d 610 (2005).

The trial court in the case at bar conducted an extensive hearing to consider the admissibility of evidence of other similar incidents. The expert witness, Friedman, explained the similarities in the accidents cited in his exhibits. All of them involved Chevrolet S-10 vehicles or the equivalent, all were rollover accidents, and all demonstrated roof crush that caused severe head or neck injury.

The trial court gave a limiting instruction, telling the jury that the evidence of other similar incidents was presented for two purposes: to support Shipler's allegation that the design of the Blazer's roof structure was defective and to support her allegation that GM knew of the alleged roof design defect prior to Shipler's accident. The court stated: "You may not use that evidence for any other purpose."

The similar incidents were reviewed and found to be substantially similar to the facts of Shipler's case. The trial court found that substantial similarity in this case related to the nature of the accident, the number of revolutions of the vehicle, the head or neck injury sustained as a result of contact with the roof, the victim's position in the vehicle, and the type of vehicle.

Our review of the incidents combined with the limiting instruction demonstrates that the trial court did not abuse its discretion in admitting the evidence of other similar incidents.

### 5. Testimony and Instructions Concerning FMVSS 216

GM asserts that the trial court erred in admitting "baseless and unconstitutional 'opinions' of a self-described 'advocate'" about GM's "supposed intent to undermine" FMVSS 216, the federal roof strength standard. GM also argues that the court erred in giving an improper and misleading jury instruction that FMVSS 216 is a federal regulation, without explaining that compliance with it is required by law.

#### (a) Background

Clarence Ditlow, executive director of the Center for Auto Safety, a nonprofit consumer organization, testified concerning federal government standards for automobile safety. It first conducts research on automobile safety and then determines areas of concern. If a standard is needed, the government issues a notice of proposed rulemaking and seeks comments from the public on the adequacy of the standard. The government then issues a final standard.

Ditlow testified that FMVSS 216, which governs roof strength in automobiles, was published in the Federal Register on December 8, 1971, with an effective date of August 15, 1973. The notice stated that the purpose of the standard was to set minimum strength requirements for a passenger car roof to reduce the likelihood of roof collapse in a rollover accident. The standard has been codified at 49 C.F.R. § 571.216 (1998).

GM submitted comments on the proposed standard on April 5, 1971, and these comments were received into evidence. In the document, GM recommended a test procedure if the government deemed it necessary to have a standard on roof strength. GM said

it could comply with an effective date of 24 months after issuance of the standard, assuming that the effective date coincided with the introduction of a new model year. In its comments, GM also recommended deletion of the requirement that the test be repeated so that both front corners of the roof were tested.

## (b) Expert Testimony on FMVSS 216

GM argues that the trial court erred in permitting Shipler's expert, Ditlow, to testify regarding the history of FMVSS 216 and its effect on automobile safety.

At the time of trial, Ditlow had been the executive director of the Center for Auto Safety for more than 30 years. The center is an organization founded in 1970, and its mission is to improve the safety, reliability, and efficiency of vehicles. It analyzes 50,000 consumer complaints related to automobile safety every year. Ditlow has testified before Congress on more than 30 occasions. GM did not object at trial to Ditlow's qualification as an expert on government regulation of the automobile industry.

Ditlow explained that manufacturers participate in rulemaking by stating their position on the proposed standard. Ditlow said GM's position concerning a proposed rule on roof intrusion was that roof crush did not relate to injury. Ditlow said that if the rule had been implemented as GM proposed, GM would have been able to meet the standard without changing the structure of its vehicles. He asserted: "The standard is to improve safety, but if you amend the standard as General Motors later proposed, they wouldn't have to modify the vehicles, they wouldn't have to strengthen the roofs." GM objected when Ditlow was asked: "So rather than making the cars strong enough to pass the test, they made the test weak enough so the cars would pass?" The objection was overruled, and Ditlow responded, "Yes."

In a sidebar, GM objected that Shipler was attempting to elicit testimony about GM's "exercise of its Constitutional rights to petition the federal government." If the trial court allowed the testimony, GM asked for an instruction stating that corporations have a right to petition the government. The court overruled the objection, stating that GM was "putting forward [FMVSS] 216 as a reasonable standard by which to measure its conduct" and

that Shipler had the right to attack it. The court declined to give a limiting instruction.

Later, Ditlow was asked if FMVSS 216 ensured safety of motorists in rollover accidents, and GM objected on the ground that the answer from this expert would invade the province of the court and the jury. The objection was overruled, and Ditlow said that the standard did not ensure motorists' safety and that there was no federal motor vehicle safety standard that reduced the likelihood of a rollover. Ditlow opined the roof strength standard was not stringent enough to ensure adequate roofs. In a "real world crash where there is a first side impact followed by a second side impact the roof will crush inward and you will see the levels of roof intrusion that . . . caus[e] deaths and serious injuries in vehicles on the road." Ditlow opined that stronger roofs would prevent that type of injury and death.

On appeal, GM objects to Ditlow's testifying as an expert on government regulation of the automobile industry as it relates to safety because he was a "self-proclaimed consumer advocate lawyer," and not an expert. See brief for cross-appellant GM at 43. GM did not object when Ditlow referred to himself as an expert on automobile safety or when he explained his background in the automobile safety area. It did not move to strike the testimony on the basis that Ditlow was an advocate rather than an expert. Failure to make a timely objection waives the right to assert prejudicial error on appeal. *Genthon v. Kratville*, 270 Neb. 74, 701 N.W.2d 334 (2005).

The two objections made during Ditlow's testimony do not support GM's argument that he gave improper opinions. Ditlow was asked during direct examination about the timeframe of GM's general technical committee meetings. The first meeting was held prior to the date that the proposed roof crush standard was issued. Shipler's counsel asked if the second meeting was held after the proposed standard had been issued and after an internal report showed that five of six GM cars "flunked" the proposed tests, and Ditlow responded, "Yes." GM objected to the "argumentative use of the word 'flunk'" and to foundation, because it was not known if Ditlow knew about GM's internal information system. The objection was overruled as to foundation, and the trial court found that the word "flunked" had

previously been used in relation to the document. The other objection occurred when Ditlow said FMVSS 216 did not ensure the safety of motorists in rollover accidents. The objection was asserted on the ground that the answer would invade the province of the court and the jury. The objection was overruled.

Generally, a trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 694 N.W.2d 610 (2005). We conclude there was no abuse of discretion in the trial court's rulings on these objections.

GM argues that Ditlow had no special knowledge, skill, experience, training, or education to qualify him as an expert on the subject of GM's motivation in commenting on the proposed safety standard, but it did not object to Ditlow's testifying as an expert witness or when Ditlow stated that he was an expert on government regulation of automobile safety. Where the grounds specified for the objection at trial are different from the grounds advanced on appeal, nothing has been preserved for an appellate court to review. *Ford v. Estate of Clinton*, 265 Neb. 285, 656 N.W.2d 606 (2003).

GM also argues that Ditlow's speculation about GM's participation in the regulatory process was constitutionally out of bounds, because corporations, like any other citizen, have a constitutional right to petition the government and cannot be subject to liability for exercising that right. During Ditlow's testimony, GM objected that his testimony implied that GM was attempting to petition the government and that his testimony somehow violated GM's constitutional rights. The trial court overruled GM's objection and declined to give a limiting instruction informing the jury that GM had the right to petition the government. The court noted GM's position implied that its conduct should be measured by FMVSS 216.

GM points out that its "central defense" was its compliance with FMVSS 216, which it claimed was sufficient in and of itself to produce vehicles that were crashworthy in rollover accidents.

See brief for cross-appellant GM at 42. In its opening statement, GM told the jury that GM not only complied with FMVSS 216, but that GM exceeded it by a significant margin. In closing arguments, GM asserted that its standard exceeded that set by the government.

GM has not shown that it was unfairly prejudiced by Ditlow's testimony. The trial court did not abuse its discretion in allowing Ditlow to testify.

### (c) Jury Instruction

GM also complains that the trial court gave an improper jury instruction regarding FMVSS 216. On the fourth day of deliberations, the jury sent a request to the court asking the following question: "Is FMVSS 216 a Federal Law . . . or is it a standard for the automotive industry?" The court told the parties that it planned to tell the jury that FMVSS 216 is a federal regulation. GM objected and asked the court to use one of the following alternatives as an instruction: (1) Compliance with FMVSS 216 is required by federal law, (2) federal law requires compliance with FMVSS 216, (3) FMVSS 216 is a mandatory requirement to federal law, or (4) FMVSS 216 is a federal regulation required by federal law. GM claimed that the court's proposed response did not answer the question. The court gave the following instruction: "FMVSS 216 is a federal regulation."

GM now argues that the instruction as given was ambiguous because it did not explain whether the law or industry set the standard. Whether a jury instruction given by a trial court is correct is a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 694 N.W.2d 610 (2005). In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Gary's Implement v. Bridgeport Tractor Parts*, 270 Neb. 286, 702 N.W.2d 355 (2005). The instruction as given was a correct statement of the law. FMVSS 216 is codified in the Code of Federal Regulations. Thus, it is a federal regulation. The jury

did not request an explanation of the distinction between a law and a regulation. Rather, it asked whether FMVSS 216 was a law or an industry standard.

The trial court's instruction did not differ in meaning from the instruction proposed by GM. In reviewing a claim of prejudice from instructions given or refused, an appellate court must read the instructions together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence, there is no prejudicial error. *Pribil v. Koinzan*, 266 Neb. 222, 665 N.W.2d 567 (2003). GM has not demonstrated any prejudice from the instruction.

### 6. ERRORS RELATED TO VERDICT

GM makes three assignments of error related to the verdict. It argues that the trial court erred in failing to strike the award for future wage loss; that the court erred in giving a detailed limiting instruction regarding Shipler's collateral source benefits; and that the court erred in upholding the jury's verdict, which resulted from passion and prejudice.

### (a) Future Wage Loss

GM claims the award of future wages was based upon improper speculation and, therefore, was not proved to a reasonable certainty. It argues that one of Shipler's experts, Charles Linke, who holds a doctor of business administration degree, did not opine to a reasonable degree of economic certainty regarding her loss of earning capacity. It claims that Linke had inadequate information to be able to express an opinion to a reasonable degree of certainty and therefore looked to the jury to fill in the blanks and that the only evidence that Shipler cited to support her future earnings was 2 years of prior earnings.

At trial, Linke testified that Shipler's worklife expectancy was 19.5 years. He explained variables, including the growth rate of compensation and the interest or discount rate. He provided examples of the application of his formula and explained the use of the calculation to determine Shipler's future loss of wages based upon the findings of earning capacity. He testified to Shipler's total earnings in 1996 and 1997 based upon her income tax returns and testified that the earnings of an average female

worker who had a high school education and was 35 to 39 years of age, like Shipler, was $25,811 in 2001.

Because Linke was unable to state Shipler's earning capacity precisely, GM moved for a directed verdict on the future wage-loss issue. It claimed that no witness had quantified such loss with any certainty. The motion was overruled.

Leonard Matheson, Ph.D., an occupational rehabilitation expert, testified about Shipler's goals for the future, stating that Shipler would never work again. He testified that Shipler had been earning $6.50 per hour for a 40-hour week plus tips as a bartender prior to the accident.

Shipler argues that neither GM nor Long objected to Linke's testimony as being speculative, nor did they present any evidence to contradict it. Shipler claims that the evidence provided the jury with a range of possible earning capacity.

A plaintiff's evidence of damages may not be speculative or conjectural and must provide a reasonably certain basis for calculating damages. *Pribil v. Koinzan*, 266 Neb. 222, 665 N.W.2d 567 (2003). "The general rule is that uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty as to the amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss." *Id.* at 226-27, 665 N.W.2d at 572. Proof of damages to a mathematical certainty is not required, but a plaintiff's burden of offering evidence sufficient to prove damages cannot be sustained by evidence which is speculative and conjectural. See *id.* The proof is sufficient if the evidence is such as to allow the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness. See *id.*

The question of whether the evidence of damages is reasonably certain is a question of law, and not a matter to be decided by the trier of fact. *Id.* The trial court must first determine whether the evidence of damages provides a basis for determining damages with reasonable certainty, i.e., is not speculative or conjectural. *Id.* If such a basis is provided, the issue of damages can be submitted to the jury. The jury is instructed that the plaintiff must prove the nature and extent of the damages by the greater weight of the evidence, not whether the evidence of damages is reasonably certain. See *id.* The jury is to award such

damages only where the evidence shows that the future earnings or pain and suffering for which recovery are sought are reasonably certain to occur. See *id.*

When the plaintiff seeks prospective damages, the contingent nature of the damages claimed inherently requires consideration of future events that can only be reasonably predicted, but not conclusively proved, at the time of trial. In such instances, the jury should be instructed, when the evidence warrants, that the plaintiff may recover damages for injuries "reasonably certain" to be incurred in the future.

*Id.* at 229, 665 N.W.2d at 574.

 The fact that Shipler would incur damages in the future was reasonably certain. The question for the jury was the amount of her damages. The jury was given sufficient evidence from which it could determine a range of damages for Shipler's future loss of wages. The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Big River Constr. Co. v. L & H Properties*, 268 Neb. 207, 681 N.W.2d 751 (2004).

We also note that the jury returned a general verdict that did not delineate the type and amount of damages included therein. We are unable to determine the specific amounts it awarded for medical expenses, future loss of wages, and pain and suffering. The trial court instructed the jury that if it decided Shipler was entitled to recover damages for any future losses, it must determine the present cash value of those losses. We conclude the evidence supports the jury's verdict and is reasonably related to the elements of the damages proved.

### (b) Collateral Source Instruction

Shipler testified that the federal and state governments paid her medical expenses and living costs. GM objects to what it terms the trial court's "limiting instruction" concerning evidence of government benefits paid to Shipler. It asserts that the instruction violated the collateral source rule, which provides that benefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish

the damages otherwise recoverable from the wrongdoer. See *Mahoney v. Nebraska Methodist Hosp.*, 251 Neb. 841, 560 N.W.2d 451 (1997). GM argues that Shipler's testimony regarding government payments improperly informed the jury of her limited financial means and thus induced the jury through sympathy to find for her and, at the least, to increase its award based upon its perception of her financial status. We conclude that this argument is without merit.

The underlying theory of the collateral source rule is designed to prevent a tort-feasor from escaping liability based on the actions of a third party, even if it is possible that the plaintiff may be compensated twice. *Id.* Shipler testified that her medical bills were paid by Medicaid, her rent and household expenses were paid by disability and Social Security benefits, she received aid for dependent children benefits for her son, and all her medical care and living expenses were provided by either the state or the federal government. GM did not object to the testimony. The jury was instructed that if it found one or both of the defendants liable, it could not reduce the damages by the amount paid by these other sources because if Shipler recovered, she might be required to reimburse the funds paid by the other sources. The law prevents a wrongdoer from escaping paying damages because of the actions of these other sources. We conclude that this instruction was not erroneous and was not prejudicial.

### (c) Excessive Verdict

GM argues the verdict was excessive and the result of passion and prejudice. One of the bases for a new trial is excessive damages appearing to have been given under the influence of passion or prejudice. See Neb. Rev. Stat. § 25-1142(4) (Cum. Supp. 2004). In order for an award to be so excessive as to warrant a new trial, it must be so clearly against the weight and reasonableness of the evidence and so disproportionate as to indicate that it was the result of passion, prejudice, mistake, or some means not apparent in the record, or that the jury disregarded the evidence or rules of law. See *Mahoney v. Nebraska Methodist Hosp., supra.*

In the case at bar, the trial court overruled the defendants' motion for remittitur, noting that the past and future medical

expenses had a present value of between $9 and $10 million and that neither of the defendants had contested this evidence. The evidence established that Shipler is unemployable and will incur an ongoing loss of income for the rest of her projected life expectancy of 45 years from the time of trial, which she will live as a quadriplegic.

The jury awarded Shipler $19,562,000. The trial court later amended the judgment by reducing it by 5 percent based upon the court's conclusion that Shipler had agreed to a 5-percent reduction in mitigation as to whether the seatbelt was misused. Judgment was then entered in the amount of $18,583,900. In overruling the defendants' motion for remittitur, the court found no evidence that the damages were excessive or that they were awarded in the heat of passion or under any other undue influence.

The jury was instructed as to the items it could consider in determining the amount of damages. The list included the reasonable value of medical care and supplies actually provided and reasonably certain to be needed in the future, lost wages, the reasonable value of the earning capacity Shipler was reasonably certain to lose in the future, the reasonable monetary value of the physical pain and mental suffering she had experienced and was reasonably probable to experience in the future, the reasonable monetary value of the inconvenience she had experienced and was reasonably probable to experience in the future, and the reasonable monetary value of her loss of enjoyment in the past and which she is reasonably probable to experience in the future.

As noted previously, the amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damage to be proved. On appeal, the fact finder's determination of damages is given great deference. *Big River Constr. Co. v. L & H Properties*, 268 Neb. 207, 681 N.W.2d 751 (2004). Since the jury returned a general verdict, there is no way for the court to determine the specific amounts it awarded for medical expenses, future wage loss, or pain and suffering. A jury verdict will not be set aside unless clearly

wrong. See *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 694 N.W.2d 610 (2005). We conclude the verdict was not excessive or clearly wrong.

### 7. Long's Motions to Dismiss

Long appealed from the judgment and assigned a number of errors which have been addressed by our discussion above. Long also asserts that the trial court erred in denying his motions to dismiss, because no issues were preserved involving him in the pretrial order.

One of the pretrial issues was the nature and extent of Shipler's injury and damages. In the pretrial order, the parties stipulated and agreed that Long's negligent operation of the 1996 Chevrolet S-10 Blazer proximately caused the accident. Following the pretrial order, which was entered on June 24, 2003, Shipler filed an amended petition in which she asserted that Long lost control of the Blazer and that the proximate cause of the rollover was Long's negligence. She sought judgment against GM and Long on the negligence cause of action. Long claims that Shipler should have sought a modification of the pretrial order after she filed the amended petition. Long does not offer any authority to support this contention, and we conclude it is without merit.

The purpose of a pretrial conference is to "simplify the issues, to amend pleadings when necessary, and to avoid unnecessary proof of facts at trial." *Cotton v. Ostroski*, 250 Neb. 911, 917-18, 554 N.W.2d 130, 135 (1996). After the pretrial order was entered, Shipler requested leave to file an amended petition. Long made no objection. When asked by the trial court if he would offer the same answer as that filed prior to the pretrial conference, Long responded in the affirmative. He did not file any objection to the amended petition. We conclude the trial court did not err in denying Long's motions to dismiss. Long admitted negligence, and the allocation of damages was an issue to be determined at trial.

### 8. Long's Argument Regarding Narrowing of Injury

Long also argues that the trial court erred in giving a limitation in the jury instructions that narrowed Shipler's injuries to quadriplegia only and in refusing to permit the jury to allocate

damages between GM and Long based on which injuries were caused by the conduct of each.

Shipler alleged in her amended petition that the negligence of the defendants proximately caused her "personal injuries including a complete spinal cord injury at about C-6 resulting in permanent quadriplegia." In the statement of the case presented in the jury instructions, the court stated: "Shipler received injuries resulting in quadriplegia."

At the jury instruction conference, Shipler sought leave to amend her petition "to conform with the evidence and, in particular, with respect to the spinal cord injury as being the only claim for damages [she] is making in this case." The trial court overruled Shipler's motion as unnecessary. The court stated: "Well, as I understand, and [GM's attorney] has read it to us a number of times, that the allegation is only for the spinal cord injury in the current petition; is that right?" GM responded: "That's true, Your Honor." The court went on to declare: "It does seem to me that the existing petition is consistent with the evidence that's been submitted and how the case has proceeded, so I'll overrule that motion."

Long construes Shipler's allegation concerning injury to mean she suffered " 'injuries' which 'included' quadriplegia." See brief for appellant at 30. He does so in order to argue that the case involved other unenhanced injuries (i.e., bumps, bruises, lacerations, and possible broken clavicle sustained in the initial crash), as well as an enhanced injury (i.e., quadriplegia) sustained in the "second collision" resulting from the roof crush. Such distinction is made in crashworthiness cases. See, e.g., *Kudlacek v. Fiat, S.p.A.*, 244 Neb. 822, 509 N.W.2d 603 (1994).

Limited evidence was presented regarding other injuries, including bumps, bruises, lacerations to the face and head, a laceration to the arm, and a possible broken clavicle. During testimony by Anthony Sances, Ph.D., a retired professor of biomedical engineering and biomechanics who testified on behalf of Shipler, a computer model of a drawing of a human body was offered into evidence. The drawing indicates "bruises, bumps to extremities - location not specified"; "several face lacerations"; and a laceration on the right arm. Sances testified that the information on the exhibit was drawn from medical

records. No evidence was presented that Sances personally examined Shipler. Nor was evidence offered from any physician who treated Shipler. GM's expert, Stalnaker, a biomedical engineer, also testified concerning Shipler's lacerations and possible fracture of the clavicle based upon a review of her medical records. Shipler testified that she did not notice the bumps, abrasions, and cuts at the time of the accident and that she did not remember them later because they were overshadowed by the spinal injury.

The record does not show that either Long or GM distinguished these other injuries to the jury as arising from the "first collision" as opposed to the "second collision." The trial court stated nothing in the record indicated that Shipler was trying "to secure recovery for any injury other than the broken neck, so we just have a single injury." Thus, the court denied a request to instruct the jury on apportionment of damages, because Shipler was "only requesting recovery for a single injury, that being quadriplegia." The court continued: "[T]here is no ability to divide that so far as I can see, and it's not divisible, and I'll not give that instruction."

Shipler was required to show that GM's negligence and defective design were substantial factors in causing her injuries. See *Kudlacek v. Fiat S.p.A., supra*. The jury found that she met her burden of proof against both GM and Long. She was not required to prove which injuries she would have received in the absence of the alleged defect or which injuries would have occurred if an alternative design had been used. See *id.* Since Shipler established "substantial factor" causation, the burden was on GM and Long to show apportionment of damages. See *id.* Having failed to do so, GM and Long could be held jointly and severally liable for the entire damage. See *id.*

At the jury instruction conference, Long's attorney objected to the statement of the case because it set forth Shipler's injury as "injuries resulting in quadriplegia." Long's attorney complained that "this goes into spinal cord injury only." Counsel asserted that "the evidence in this case included minor injuries . . . in addition to the . . . spinal cord injury," and counsel sought an "opportunity to argue a small recovery for the minor injuries." The court overruled Long's objection, reasoning:

The pleadings themselves . . . on which this case went forward do limit the request for recovery to the quadriplegia.

And at least as I read Nebraska law, unless there is some evidence of divisibility of the injury, there is no option available for the jury to say one defendant is responsible for X . . . amount of dollars and the other defendant is . . . responsible for Y amount of dollars.

And, therefore, it seems to me . . . the options before the jury are that . . . Long is fully responsible for the . . . quadriplegia, GM is fully responsible for the quadriplegia[,] or the two of them are responsible for the quadriplegia. I take the quadriplegia to be a single injury in my . . . analysis.

▮▮▮▮ A litigant is entitled to have the jury instructed upon only those theories of the case which are presented by the pleadings and which are supported by competent evidence. *Pleiss v. Barnes*, 260 Neb. 770, 619 N.W.2d 825 (2000). A trial court need not instruct the jury on an issue where the facts do not justify such an instruction. *Farmers Mut. Ins. Co. v. Kment*, 265 Neb. 655, 658 N.W.2d 662 (2003). Under joint and several liability, either tort-feasor may be held liable for the entire damage, and a plaintiff need not join all tort-feasors as defendants in an action for damages. *Lackman v. Rousselle*, 257 Neb. 87, 596 N.W.2d 15 (1999). Where two causes produce a single indivisible injury, joint and several liability attaches. *Kudlacek v. Fiat S.p.A.*, 244 Neb. 822, 509 N.W.2d 603 (1994).

Accordingly, the trial court did not err in instructing the jury as to Shipler's injury. The record demonstrates that Shipler's injury (i.e., quadriplegia) was not divisible, and the court did not err in refusing to permit the jury to allocate damages based on whether separate injuries were caused by each defendant.

## 9. SHIPLER'S CROSS-APPEAL

On cross-appeal, Shipler assigns as error the trial court's reduction of the jury's damage award. The jury returned a verdict of $19,562,000 in favor of Shipler against GM and Long, and the trial court entered judgment in that amount. The court later entered an amended judgment on its own motion reducing the jury's award by 5 percent to $18,583,900. The court noted that Shipler had been given leave to file an amended petition eliminating the issue of whether the seatbelt was faulty and

agreed to a 5-percent reduction in the judgment as provided by statute. The court had accepted the agreement and granted leave to file an amended petition.

Shipler now argues that the reduced judgment was error because she never agreed to the reduction. The record shows that during a pretrial hearing, Shipler stated she would stipulate that any verdict obtained by her could automatically be reduced by 5 percent by the court so that GM would not be required to introduce evidence of mitigation of damages.

In response, GM argued that the seatbelt use was still important to the case because it related to Shipler's movement within the vehicle. GM asked that it be allowed to present evidence as to the manner in which Shipler was using the seatbelt, even if Shipler stipulated to the 5-percent reduction. GM was not allowed to present evidence of the misuse of the seatbelt.

Shipler now argues that GM declined the offer of the stipulation and that, therefore, there was no agreement, demonstrating that the trial court erred in reducing Shipler's damages. In its order overruling the motion for new trial, the trial court concluded that Shipler had stipulated to the reduction of damages. This court has previously stated:

> "[S]tipulations voluntarily entered into between the parties to a cause or their attorneys, for the government of their conduct and the control of their rights during the trial or progress of the cause, will be respected and enforced by the courts, where such stipulations are not contrary to good morals or sound public policy. Courts will enforce valid stipulations unless some good cause is shown for declining to do so, especially where the stipulations have been acted upon so that the parties could not be placed in status quo. . . .
>
> "Parties are bound by stipulations voluntarily made and relief from such stipulations after judgment is warranted only under exceptional circumstances."

(Citation omitted.) *In re Estate of Mithofer*, 243 Neb. 722, 726-27, 502 N.W.2d 454, 457-58 (1993).

The trial court did not err in concluding that Shipler had stipulated in open court to a reduction of the award by 5 percent regarding the seatbelt issue. The record shows that she offered to

accept the reduction in exchange for dismissing the allegations that the passenger restraint system was defective. Shipler was bound by the stipulation, and we find no exceptional circumstances to warrant relief from it. There is no merit to Shipler's cross-appeal, and it is dismissed.

## VI. CONCLUSION

For the reasons set forth herein, the judgment of the district court is affirmed.

AFFIRMED.