IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

KESTER V. KESTER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JENNAE MARIE KESTER, APPELLEE,

V.

JEREMY PAUL KESTER, APPELLANT.

Filed November 3, 2015.    No. A-14-1055.

Appeal from the District Court for Antelope County: MARK A. JOHNSON, Judge. Affirmed.

Jane F. Langan Mach, of Rembolt Ludtke, L.L.P., for appellant.

Jason S. Doele and Tracey L. Buettner, of Stratton, DeLay, Doele, Carlson & Buettner, P.C., L.L.O., and Martin V. Klein, of Carney Law, P.C., for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

PIRTLE, Judge.

### INTRODUCTION

Jeremy Paul Kester appeals from a decree of the district court for Antelope County dissolving his marriage to Jennae Marie Kester. He raises issue with the trial court's custody determination, child support calculation, dependency exemptions, alimony award, and its valuation and division of the marital estate. Based on the reasons that follow, we affirm the decision of the district court.

### BACKGROUND

Jeremy and Jennae were married on August 8, 1998, and are the parents of four minor children: Blake, born in 1998; Christopher, born in 2001; Alec, born in 2008; and Cashten, born in 2009. Jennae filed a complaint for dissolution of marriage on July 11, 2012. Jeremy

- 1 -

subsequently filed an answer and counterclaim. Trial was held in June and July 2014. There were numerous witnesses at trial, including both parties and the court-appointed guardian ad litem (GAL), Richard David Stafford.

Jeremy is a self-employed farmer and cattle-feeder. During the marriage, Jennae did the bookkeeping for the farm and feedlot. She also attended and completed cosmetology school during the marriage and subsequently held various cosmetology jobs and had her own salon business. At the time of trial, Jennae was working at a law firm making $10.50 per hour. Both parties cared for the children, but Jennae was the primary care giver. Jennae testified that Jeremy physically and emotionally abused her during the marriage. No allegations of abuse were raised as to the children.

The evidence showed that the parties owned two parcels of real estate: an 80-acre tract of land where the parties' home was located and where Jeremy operated his cattle-feeding business; and a 160-acre tract of farm ground (known as the Kallhoff Quarter), which is subject in part to a life estate. Jennae did not want the real estate. Jeremy wanted to keep the 80-acre tract and acknowledged that the Kallhoff Quarter would have to be sold.

Blake, who was 16 years old at the time of trial, and Christopher, who was 13 years old, both testified and expressed their desire to live with Jeremy. Alec and Cashten, ages 5 and 4 at the time of trial, did not testify. The evidence showed that Blake and Christopher have become openly hostile and disrespectful toward Jennae, and encourage Alec and Cashten to behave the same way. Based on a temporary order, Jeremy has been the primary physical custodial parent of Blake and Christopher since December 2012, and Jeremy and Jennae have shared custody of Alec and Cashten.

Following trial, the court entered an amended decree of dissolution in November 2014. The court found that Jennae was a more credible witness than Jeremy. The court stated therefore, that it relied more heavily upon Jennae's credibility when the evidence was in conflict.

The court found that Jennae and Jeremy were both fit parents, but that it was in the best interests of the children that Jeremy be awarded physical custody of Blake and Christopher, and Jennae be awarded physical custody of Alec and Cashten. The parties were awarded joint legal custody of all four children. The court determined that Jennae's income for child support purposes was $1,820 gross per month, based on her full-time job at the time of trial where she was making $10.50 per hour. The court determined that Jeremy's average annual income was $69,923.50 or $5,826.96 per month. Jeremy was ordered to pay $475 per month in child support, based on a split-custody calculation. The court also awarded Jennae $500 per month in alimony for 3 years.

In regard to property division, the court ordered that the Kallhoff Quarter be sold and the proceeds split equally between the parties. It awarded Jeremy the 80-acre tract where the parties' home and Jeremy's business is located, as well as all the farming machinery and equipment. The parties' other marital property, as well as their debts, were also divided by the court. To equalize the division of property, the court ordered Jeremy to pay Jennae $171,900.00 from the proceeds of the sale of the Kallhoff Quarter.

Additional evidence will be discussed as necessary in the appropriate sections of the analysis.

ASSIGNMENTS OF ERROR

Jeremy assigns that the trial court erred in (1) failing to grant him physical custody of all four minor children, (2) giving weight to the testimony of the guardian ad litem (GAL), (3) calculating Jeremy's income and child support obligation, (4) failing to award him all of the dependency exemptions, (5) awarding Jennae alimony, and (6) valuing and dividing the marital estate, particularly by using an improper value for crop inventory and refusing to enforce a stipulation.

STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.*

ANALYSIS

*Physical Custody.*

Jeremy assigns that the trial court erred in failing to grant him physical custody of all four minor children. The GAL testified that both parents are fit and proper parents to have custody of their children, but he also had concerns about each party as a custodial parent. He testified that he had concerns about Jennae's discipline style. He had received reports of Jennae yelling and using foul language when disciplining the children. He also acknowledged that Jennae has been unstable in several areas of her life since the parties' separation namely, in employment, residences, and relationships. The GAL indicated that Jennae seems to have a constant need to be in a relationship with a man. The GAL was also concerned about the extra time she is away from home due to her 50 mile commute to work and back.

The GAL testified that Jeremy and the two older boys have more of a friendship-type relationship than a parent/child relationship. He testified that he is concerned that Jeremy has let his negative feelings toward Jennae override his concern for the best interest of his children at times. He was worried that if Jeremy's negative feelings toward Jennae continue it would interfere with the relationship between Jennae and the children, possibly even resulting in denial of visitation and contact. He testified that there had already been some indication that Jeremy was interfering with Jennae's telephone calls with the children, and that Jeremy was possibly encouraging, or at least not discouraging, treating Jennae with disrespect. The GAL further indicated that the two older boys did not tell him anything positive about Jennae. The GAL was also concerned about the younger boys' safety on the farm.

The GAL testified that Jennae has great difficulty with the two older boys and that they are openly hostile and disrespectful toward her. He testified that the way the older boys talk to Jennae is not only inappropriate, but shocking. He testified that it was clear that Blake and Christopher want to be in the physical care of Jeremy. Alec and Cashten indicated that they want to be with both parents. The GAL testified that he is concerned that if the younger two boys would be around

the older two boys on a regular basis, they will start mimicking the older brothers' behavior toward Jennae.

The GAL's testimony was not the only evidence the court relied on in making a custody determination. There was additional testimony about the dynamic between the older two boys and the younger two boys, and the way the older boys treat Jennae. The evidence showed that Jennae does not have problems with the younger boys when the older boys are not present. Jennae stated that when Blake and Christopher are at her house, the younger two boys act completely different. Jennae testified that when Blake and Christopher are with Alec and Cashten, all four of them get into trouble and are destructive, often breaking items in the house. They call each other names, make fun of each other, and pick fights. Jennae also testified that Blake and Christopher have stolen items from her, that they use foul language in front of her, talk back to her, and make fun of her. On one occasion, Christopher put a dead bird in her grill, and another time he urinated in a jug and threw it out an upstairs window, mimicking a family story about Jeremy. Jennae testified that Christopher acts differently when Blake is not around. He is well-behaved for her and they have conversations like they did before the parties separated.

Blake and Christopher both testified and expressed their desire to live with Jeremy. Alec and Cashten did not testify. Blake testified that he likes farming with Jeremy and he hopes to continue farming after high school and college. Blake testified that Jeremy spends time with him and they enjoy hunting, fishing, and sporting events together. Blake testified that Jeremy encourages him to have a relationship with Jennae and tells him that he has to go on visits with her.

Blake testified that when he is with Jennae, she does not do any activities with them and they have to entertain themselves. Jennae, in contrast, testified that when she tries to talk to the older boys she gets the "silent treatment" and when she asks them if they want to do an activity, they either do not respond or they do not want to do it.

Christopher's reasons for wanting to live with Jeremy were essentially the same as those expressed by Blake. He testified that Jeremy treats him well and he wants to stay on the farm because it is his home. Both Blake and Christopher testified that they have a good relationship with Alec and Cashten and they wanted all four boys to live together with Jeremy.

Blake, in particular, is verbally hostile toward his mother. There was testimony about a time when Blake told Jennae to "Just shut up, just go sit down." Jeremy was present and did not say anything at first and then he also told Jennae to "shut up, go sit down."

On another occasion, Blake and Jennae were arguing about Jennae disciplining the younger boys and Jennae contends that Blake was yelling at her and he spit in her face. Blake denied intentionally spitting on Jennae, contending that the "spitting" was saliva that came out of his mouth when he was arguing with Jennae. During the incident, Blake called Jennae horrible names and she slapped him. He then locked himself in the bathroom and called 911, claiming that Jennae had choked him. The officer who investigated the call testified that he saw no evidence of Blake's allegations against Jennae.

There was evidence that Blake and Christopher refused to go with Jennae for a week-long parenting time in the summer of 2013. The exchange was supposed to occur after a baseball game ended. Blake and Christopher refused to go with Jennae and they had not packed any clothes. Jeremy did little, if anything, to get the boys to go with Jennae.

The evidence showed that before the parties separated, the relationship between the children and both parents seemed to be relatively normal and free from hostility. It was not until after the separation that Blake and Christopher began the hostile behavior toward Jennae. Despite their negative behavior toward their mother, Blake and Christopher are both doing well in school and are involved in extra-curricular activities.

Although the Nebraska Supreme Court has acknowledged that it is sound public policy to keep children together when possible, considerations of public policy do not, in all cases, prevent the splitting of the custody of the children when a marriage is dissolved; rather, the ultimate standard is the best interests of the children. *Braeman v. Braeman*, 192 Neb. 510, 222 N.W.2d 811 (1974). In the present case, there is an age gap between the two older boys and the two younger boys. Blake and Christopher were 16 and 13 years old at the time of trial, and Alec and Cashten were 5 and 4 years old. At this time in their lives, this age difference is substantial. The trial court's determination that the younger children would do better with Jennae does not seem improper. The court stated that it was concerned that Alec and Cashten would become alienated from Jennae if physical custody was awarded to Jeremy. The court was also concerned that Blake and Christopher would have a negative influence on their younger brothers and their relationship with Jennae if all four children reside in the same house. There seems to be no evidence compelling a different result from that ordered by the district court. Based on the circumstances of this case, we determine that split custody is in the best interests of the children. Accordingly, there was no abuse of discretion by the trial court in ordering that Jeremy would have physical custody of Christopher and Blake, and that Jennae would have physical custody of Alec and Cashten. Jeremy's assignment of error regarding this issue is without merit.

In regard to custody, Jeremy also assigns that the trial court erred in giving weight to the testimony of the GAL. Jeremy contends that the trial court relied extensively on the GAL's testimony and that his testimony should not have been given any weight because the GAL did not conduct a fair and impartial investigation. Jeremy points to several statements made by the GAL indicating that he improperly employed gender bias in favor of Jennae in his investigation. For example, the GAL testified that he made several unannounced visits to Jeremy's home at mealtime because "[he] wanted to check to see what kind of meal preparation was going on. Sort of a sexist approach to things because just checking out to see if dad could really cook." The GAL was also asked if he made any unannounced visits to Jennae's home to which he responded that he did not and that "[he] was being sexist and seeing if a father could keep the house."

Jeremy also argues that the GAL's investigation relied disproportionately on contacts he had with Jennae. The GAL testified that he had contact with Jennae at least 10 times in regard to the case, and seven attempted contacts with Jeremy. Six of the seven contacts were unannounced and around mealtime, and Jeremy was not home for three of the six unannounced visits. The GAL also interviewed Jennae's mother, but did not interview Jeremy's mother or father. However, the GAL testified that his main reason for not doing so was because he had over 100 affidavits submitted to him from Jeremy's family and friends.

Jeremy is essentially challenging the GAL's credibility. Although in a divorce action the case is reviewed on appeal de novo, the appellate court will give weight to the fact that the trial court observed the witnesses and their manner of testifying and accepted one version of the facts rather than the opposite. See *Logan v. Logan*, 22 Neb. App. 667, 859 N.W.2d 886 (2015).

Obviously, a trial court weighs the credibility of the witnesses and the evidence and determines what evidence should be given the greater weight in arriving at a factual determination on the merits. *Id.* See also *Griffith v. Drew's LLC*, 290 Neb. 508, 860 N.W.2d 749 (2015) (the weight to be given a witness' testimony is a question for the trier of fact). Thus, we conclude that the trial court did not err in considering the GAL's testimony in determining custody of the parties' minor children.

*Child Support.*

Jeremy next assigns that the trial court erred in calculating his child support obligation. He argues that his child support amount is wrong because the court improperly calculated his income in two ways. First, he contends that the court failed to account for the loss of income that will occur from the sale of the Kallhoff quarter. Second, he argues that the trial court incorrectly found that his tax returns did not adequately represent his income.

In regard to Jeremy's first argument that the court failed to adjust his income to account for the sale of the Kallhoff quarter, he contends that the sale of this land, which the trial court ordered, will decrease his annual income by $10,000 to $15,000. The trial court however, found that "[t]he sale of the Kallhoff quarter is not anticipated to materially affect [Jeremy's] earnings."

The trial court asked Jeremy how the sale of the Kallhoff quarter will affect his income and he was unable to provide a clear or specific answer, and did not state any amount. When his counsel subsequently asked him if he could "estimate for us with reasonable certainty what change there will be for his income" as a result of the sale of the Kallhoff quarter, Jeremy ventured a guess of "maybe $10,000 to $15,000." There was no other evidence offered to support this claim. The land was used mainly as a place to spread manure from the feedlot and to raise feed for the cattle. There was no specific testimony as to what this use was worth. Jeremy admitted that if he has to get corn from an elevator, rather than using feed he has raised himself, he passes the extra cost on to his customers. We find the trial court did not abuse its discretion in failing to adjust Jeremy's income based on the sale of the Kallhoff quarter.

Jeremy's second argument in regard to his income for child support purposes is that the trial court incorrectly found that his tax returns did not adequately represent his income. The trial court stated that Jeremy's income tax returns for 2010 and 2011 showed that his income was $11,500 and $16,708, respectively. However, based on other evidence presented, the trial court found that the income tax returns were not reflective of Jeremy's true income and that Jeremy's average annual income was $69,923.50.

As a general matter, in the determination of child support, income from a self-employed individual is determined by looking to that person's tax returns. *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007). However, a flexible approach is used in determining a person's "income" for purposes of child support, because child support proceedings are, despite the child support guidelines, equitable in nature. *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004). Jeremy acknowledges that a trial court can include perks from a closely held corporation in calculating income for child support purposes, and that this can include situations where a sole or majority shareholder uses the corporation to pay for personal expenses. See *Gangwish v. Gangwish. Id*. However, Jeremy argues that the trial court imputed income to Jeremy on the theory

that personal expenses were paid for through the farming business when there was no direct evidence from either party that this occurred.

The trial court relied on the testimony of Bradley Larson, a Certified Public Accountant, a witness called by Jennae. Larson testified that he reviewed the parties' income tax returns, general ledger information from QuickBooks (the bookkeeping program used for Jeremy's business), and financial statements. Larson testified that he first reviewed the tax returns, which showed Jeremy's gross income was less than $20,000 annually, some years as low as $13,000 or $14,000, and that his taxable income was lower than that. He testified that such low income was a "red flag" to him because it is tough for a family of six to live on $12,000 to $15,000 a year, especially when the tax returns also show that health insurance is over $5,000 per year. Larson testified that income tax returns do not always reflect a sole-proprietor's income.

He testified that he reviewed the QuickBooks ledgers for Jeremy's business from 2010 and 2011 and determined that some of the expenses were for personal living expenses, like clothing and groceries, rather than business expenses. Based on these personal expenses being paid through the business, he determined a much higher income for Jeremy than reflected on his tax returns. Larson testified that in 2010, there was $65,407 used from the farming operations to pay for the family's living/personal expenses. In 2011, the amount was $74,440. He explained that there may have been other personal living expenses that were not easily identifiable or that were not on the QuickBooks ledger, such as utilities or insurance. Additionally, Jeremy's gross receipts for the farming operation are approximately the same in 2012 and 2013 as they were in 2010 and 2011. Larson believed that if he were to add up the personal expenses for 2012 and 2013, the amounts would be similar to 2010 and 2011.

The trial court found that Larson's estimation was further supported by a February 24, 2012, balance sheet which shows anticipated withdrawals for "Family living" of $60,000 for the dates of March 1, 2012, to February 28, 2013. The balance sheet was executed by both parties on March 20, 2012, and as such, the trial court found the figures deemed credible as admissions. The trial court additionally noted that Larson's cash flow estimation was further supported by the evidence that Jeremy was able to pay $60,000 in attorney fees during the two years before trial without incurring any debt or having money given to him by family.

Jeremy offered no other evidence of his income other that his tax returns. Accordingly, the trial court considered all the evidence before it to come up with a more reasonable estimate of Jeremy's income. It determined that Jeremy's average annual income as shown by Larson's testimony was $69,923.50 or $5,826.96 per month, which averaged the two full years (2010 and 2011) of family expenses paid from operations prior to the mid-year 2012 separation of the parties. We conclude that the trial court did not err in determining Jeremy's income for child support purposes.

*Dependency Exemptions.*

Jeremy assigns that the trial court erred in failing to award him all four of the dependency exemptions. He argues that he is entitled to all four dependency exemptions because he provides the primary support for the children. Although the trial court did not specifically state in its amended decree who was entitled to the dependency exceptions, it is clear from the child support

worksheets that each custodial parent would claim the children in his or her custody for tax purposes.

Under Nebraska law, a court having jurisdiction in a dissolution action has the power to allocate tax dependency exemptions as part of the dissolution decree. *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000). An award of a dependency exemption is reviewed de novo to determine whether the trial court abused its discretion. *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005).

The dependency exemption for income tax returns is an economic benefit. *Kalkowski v. Kalkowski, supra*. A tax dependency exemption is nearly identical in nature to an award of child support or alimony. *Emery v. Moffett, supra*. The general rule is that a custodial parent is presumptively entitled to the federal tax exemption for a dependent child. *Id.* But, a court may exercise its equitable powers to allocate the exemption to a noncustodial parent. *Id.*

In the instant case, each party was awarded the custody of two children and each was awarded two dependency exemptions. We conclude that the trial court did not abuse its discretion in awarding each party dependency exemptions for the children in their custody.

*Alimony.*

Jeremy assigns that the trial court's alimony award to Jennae of $500 per month for 3 years was an abuse of discretion. He argues that no alimony should have been awarded. He again argues that his income was figured incorrectly and that based on the actual economic circumstances of the parties no alimony award is warranted. He further contends that Jennae will receive cash from the sale of the Kallhoff quarter and an equalization payment, while he will receive almost nothing in cash.

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Bussell v. Bussell*, 21 Neb. App. 280, 837 N.W.2d 840 (2013). In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id.* Alimony should not be used to equalize the incomes of the parties or to punish one of the parties. *Id.* In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness. *Id.* The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id.*

The parties were married almost 14 years at the time of separation on July 1, 2012. Jennae worked part-time during most of the marriage and was the primary caregiver for the parties' four children and was the one responsible for the day-to-day upkeep of the home. Jennae earned a degree in cosmetology during the marriage and had a salon business for a time, which closed due to the separation of the parties and the small community in which the salon was located.

Jeremy had been a cattle feeder and farmer throughout the marriage, and this operation was the family's main source of income. Jennae helped out on the farm at times and did all of the bookkeeping for the farming operation.

At the time of trial, Jennae was earning approximately $1,820 per month and Jeremy, as previously discussed, was earning approximately $5,826 per month. Accordingly, there is a large disparity in the monthly incomes of the parties.

Given the circumstances in this case, an award of alimony of $500 per month for 3 years is not unreasonable and not an abuse of discretion by the trial court.

*Valuation and Division of Marital Estate.*

Jeremy also assigns that the trial court erred in its valuation and division of the marital estate. Specifically, he argues that the court used an improper value for crop inventory which skewed the marital estate by approximately $70,000, and that the court improperly refused to enforce a stipulation of the parties and its own order.

In regard to the crop inventory, the parties stipulated and the court made clear that the assets and debts were being valued as of July 2012, when the action was filed. Jeremy contends that despite the agreed upon valuation date, the court used $86,000 as the value of crop inventory, which was the amount of inventory in February 2012. Jeremy contends that by July, after normal operation of the feedlot, his crop inventory was only $17,500, resulting in a mistake in the amount of $68,500.

The value of crop inventory used by the court came from a balance sheet dated February 24, 2012. However, it was the only evidence the court had as to crop inventory value, aside from Jeremy's testimony. Jeremy estimated that by July 2012, he had $2,500 in silage and $15,000 in hay. He testified that his corn was gone and any inventory of corn that existed belonged to his father and brothers. Jeremy's testimony was contradicted by William Kester, Jeremy's uncle and his banker, who testified that he is familiar with cattle-feeding operations and that an individual running a typical feeding operation would buy his hay and corn a month or two in advance. Therefore, it would be a rare occurrence for a feedlot to not have any corn for feed. Jeremy was later questioned about William Kester's testimony and Jeremy admitted that he always has hay and grain on hand.

The trial court apparently did not find Jeremy's testimony about the value of crop inventory in July 2012 credible. The only other evidence of value was found on the February 2012 balance sheet. We conclude that the trial court did not abuse its discretion in using the value of $86,000 for crop inventory.

Jeremy next argues that the trial court improperly refused to enforce a stipulation of the parties and its own order. During the pendency of the case, on or about December 3, 2012, the parties entered into a stipulation that provided:

> [Jeremy] shall pay temporary support to [Jennae] commencing December 1, 2012, in the amount of $1,400.00 per month and continuing in a like amount on the first day of each month thereafter, without prejudice to issues concerning the amount of support, or custodial arrangements, or the best interests of the minor children. . . . The sum of these temporary payments shall be subtracted from the final settlement amount [Jennae] is awarded.

The trial court approved the stipulation and incorporated the language quoted above in its temporary ordered dated December 6, 2012.

Stipulations voluntarily entered into between the parties to a cause or their attorneys, for the government of their conduct and the control of their rights during the trial or progress of the cause, will be respected and enforced by the courts, where such stipulations are not contrary to good morals or sound public policy. *Cervantes v. Omaha Steel Castings Co.,* 20 Neb. App. 695, 831 N.W.2d 709 (2013); *Theisen v. Theisen,* 14 Neb. App. 441, 708 N.W.2d 847 (2006). Stipulations cannot be contradicted by evidence tending to show the facts to be other than as stipulated. *Cervantes v. Omaha Steel Castings Co., supra.* However, the Nebraska Supreme Court has also held that courts will enforce valid stipulations *unless some good cause is shown for declining to do so,* especially where the stipulations have been acted upon so that the parties could not be placed in status quo (emphasis added). See *Shipler v. General Motors Corp.,* 271 Neb. 194, 710 N.W.2d 807 (2006).

Despite the parties' stipulation regarding Jeremy's temporary support payments, the trial court declined to subtract the sum of the temporary payments from the final settlement amount awarded to Jennae. The court found as follows:

[Jeremy] invites this Court to credit him with funds paid in excess of that child support shown due during the pendency of this matter and for funds expended of behalf of [Jennae] for miscellaneous and/or periodic expenses during the pendency of this matter. The Court finds that no such credit should be given for two reasons. The first is that [Jennae], while receiving temporary support, did not receive any rental payments for the use of the parties' real estate, machinery and equipment for the two years this matter was pending. The payments by [Jeremy] in which [Jeremy] seeks credit offset those amounts arguably due to [Jennae] for rent. The second reason is that the temporary child support is based upon a representation of income from [Jeremy] which the Court believes was disingenuous and not truthfully representative of [Jeremy's] earnings from his farming and feeding operations. The "extra" child support [Jeremy] paid is more in keeping with that amount due and owing under what the Court now finds is [Jeremy's] true earnings.

It is unclear whether the "temporary support" payments of $1,400 per month were intended to be spousal support or child support. Either way, the trial court's reasons for not enforcing the stipulation appear to be fair and reasonable under the circumstances, and it is implicit in its decision that the trial court found "good cause" not to enforce the stipulation entered into by the parties. We cannot say that the district court abused its discretion in finding good cause not to enforce the stipulation.

## CONCLUSION

We conclude that the trial court did not err in its custody determination, child support calculation, award of dependency exemptions, alimony award, and in valuing and dividing the marital estate. Accordingly, the trial court's amended decree is affirmed.

AFFIRMED.